### HOLLENBACK v. HAND et al.

(Circuit Court, N. D. New York. October 11, 1911.)

**1. NEGLIGENCE (§ 136\*)—STRENGTH OF MATERIALS—QUESTION FOR JURY.**

Where a servant was killed by the collapse of a concrete pier, and plaintiff claimed that the pier fell because the materials of which it was made were improper, and that the concrete was not properly mixed, evidence *held* to require submission to the jury of the strength of the materials and whether defendant company knew or should have known it would make weak concrete.

[Ed. Note.—For other cases, see Negligence, Dec. Dig. § 136.\*]

**2. NEGLIGENCE (§ 44\*)—DEFECTIVE PIER.**

Where decedent, a servant of a steel company, was killed by the collapse of a concrete pier, provided for the construction of a bridge, owing either to the neglectful use of improper materials or the improper mixing of materials, or to the premature use of the pier before it had time to set, there being no allegation or evidence that defendant was negligent in allowing the steel company to go on the work before it had time to set, defendant was only liable in case it was established that the pier was constructed of improper materials or that proper materials were not properly mixed.

[Ed. Note.—For other cases, see Negligence, Dec. Dig. § 44.\*]

**3. NEGLIGENCE (§ 124\*)—EVIDENCE—STATEMENT OF SUPERINTENDENT.**

Where the servant of a steel company was killed by the collapse of a concrete bridge pier constructed by defendant company, due either to the fact that the pier was constructed of improper materials or negligently constructed of proper materials, or used by the steel company before it had time to set, the opinion of the superintendent of the entire work employed by the owner and known to both defendant and the steel company, that the pier would be all right to go on at the end of seven days after completion, and that such statement was relied on by the steel company and its employés, was inadmissible.

[Ed. Note.—For other cases, see Negligence, Dec. Dig. § 124.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. NEGLIGENCE (§ 131*)—DEATH OF SERVANT—REPAIR OF DEFECTIVE CONSTRUCTION—EVIDENCE.

Where decedent was killed by the collapse of a concrete pier, and it was material to determine whether the catastrophe was due to the improper construction of the pier, in which event only would defendant be liable, or to the premature use of the pier by decedent's employer, evidence that six or seven months following the pier was repaired with concrete made of the same material allowed to stand three to six weeks before placing the superstructure thereon, and that it then bore the load, which evidence was not limited to show that certain of the materials properly combined and used had proved strong and efficient for the purpose intended, was improper.

[Ed. Note.—For other cases, see Negligence, Dec. Dig. § 131.*]

5. TRIAL (§ 207*)—EVIDENCE—PURPOSE—LIMITATION.

Evidence competent for one purpose but incompetent for another may be admitted to answer the purpose for which it is competent; but its admission and use should be limited to that purpose, and the jury should be instructed that they are not at liberty to consider it for any other.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 498, 499, 501; Dec. Dig. § 207.*]

6. TRIAL (§ 79*)—RECEPTION OF EVIDENCE—OBJECTIONS—NECESSITY.

Where, during the examination of a witness, the court, by making a statement as to what it understood the defendant was seeking to prove and the purpose of it, stated it thought the evidence competent, and therefore overruled the objection, plaintiff's counsel was thereby given to understand that it was not necessary to object further, and, the ruling being erroneous, the objection should be considered sufficient.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 192; Dec. Dig. § 79.*]

At Law. Action by Harry S. Hollenback, as administrator, etc., of Jeremiah Hollenback, deceased, against Augustus N. Hand and another, as receivers of the Elmore & Hamilton Contracting Company. On plaintiff's motion to set aside a verdict for defendants, and for a new trial on the ground that the verdict is clearly against the weight of the evidence and not supported thereby, and for prejudicial errors in the admission and rejection of evidence. Granted.

Frost, Daring & Warner, for plaintiff.
H. V. Borst, for defendants.

RAY, District Judge. The Washington & Berkeley Bridge Company, a West Virginia corporation, as owner, undertook the construction of a bridge across the Potomac river near Williamsport, Md. The piers were to be of concrete from 20 to 40 or more feet in height and were designed to carry a steel superstructure of great weight and during construction heavy machinery for placing it and cars after construction. It was, of course, necessary that these piers should be strong and well constructed of suitable material well and thoroughly mixed and placed properly and left to harden or set at least a suitable time before placing a load thereon. The defendant company owed a duty to all who should go upon the piers while placing the superstructure to do its work properly and efficiently in all respects, and, if it knew the materials furnished for the construction of such piers were unsuitable and made a weak and dangerous struc-

ture, to notify the Pennsylvania Steel Company and its employés of the defects and danger. To this end, so far as construction was concerned, there were plans and specifications; but no time was fixed within which a load should not be placed thereon after completion, and nothing was said in the specifications as to the time the forms should be left on the various sections of a pier as the work of construction progressed. As matter of fact, after some of the piers were completed, the work of placing the steel superstructure was commenced and carried forward, so that it was placed or being placed on pier No. 10, counting from the Maryland side of the river, some seven days after this pier was completed. The weather at this time, December 16, 1908, was quite cold and damp, and there was evidence that such weather as this would delay the setting and hardening of the concrete material. The owner, Washington & Berkeley Bridge Company, let the contract for erecting the piers to the defendant company, the Elmore & Hamilton Contracting Company, and let the contract for erecting the steel superstructure thereon to the Pennsylvania Steel Company. As, after a little time, both companies were working on this bridge at the same time, each could see what the other was doing and how the work was being done and the materials used. There was an engineer in charge of the entire work for the owner, and each contracting company had a foreman or superintendent. Jeremiah Hollenback was in the employ of the Pennsylvania Steel Company and engaged with others in placing the superstructure. There was no contractual relation between the defendant company and the steel company, nor was there any such relation between the deceased and the defendant company. However, the defendant company owed the duty before mentioned to Hollenback.

On the morning of December 16, 1908, while Hollenback, with other employés of the Pennsylvania Steel Company, was engaged in placing the iron beams extending from pier 9 to pier 10, on pier 10, and after same had been partially placed, the top portion of pier 10 gave way, that is, the girder or beam placed thereon on the upstream side cut or sheared right down through the upper part of the concrete pier and the girder, crane, traveler, and other ironwork with the men thereon, including Hollenback, the deceased, were precipitated to the bed of the stream some 40 feet below, and Hollenback received injuries from which he died.

The contention of the plaintiff was and is that the concrete was of improper material, improperly mixed, and weak and rotten owing to the negligence of the defendant company in using same and in constructing such pier, and that its negligence was such as to charge it with notice of such weakness, and that it turned this pier over or allowed same to pass to the hands of the Pennsylvania Steel Company for the uses and purposes intended knowing of such weakness, improper construction, etc., or legally charged with notice thereof, without notice to that company, and hence was and is responsible for the consequences that followed. The contention of the defendant was and is that the concrete was all right, composed of suitable material, properly mixed and placed, but that the weather conditions were

such that the Pennsylvania Steel Company went upon such pier and placed the load thereon before the concrete had had time suitably to set and harden, and that the pier gave way because of this premature use; the defendant company being free from all fault and negligence on its part. There was evidence of some haste in the completion of this pier No. 10, and that the concrete for the part that gave way was mixed by hand instead of with machinery or a mixer, as the material used up to that time for the construction of the piers had been. Evidence was allowed under objection and exception that, after pier 10 gave way, the pier was in May, June, or July following, as to this top portion, reconstructed by the owner, Berkeley Company, of the same kind of sand, or sand from the same bank in the river, same crushed stone, that is, crushed stone of the same character from the same quarry and crushed in the same way, same kind of cement, all mixed into concrete in substantially the same way and allowed to stand some three to five weeks before use, and that the load, steel superstructure, etc., was then placed thereon, and that the pier carried the load without giving way. The steel superstructure was being placed by the Pennsylvania Steel Company when the accident happened, and that company placed it after the pier had been reconstructed in the early summer following. This evidence was offered and allowed for the purpose of showing that the sand, stone, and cement used were proper, suitable, and sufficient as to quality for the purpose, and that there was no negligence in using it, but it was not specifically limited to that purpose. There was evidence that the sand used was not such as the contract called for—that is, "clean, sharp, coarse sand"—as it was taken from the banks of the Potomac river at low water and was sand that had been washed down and left by the flow of the river at high water, and that it contained some leaves, sticks, etc. There was evidence that this tended to weaken the concrete. There was evidence also to the contrary. There was also evidence that the mixing of concrete by hand sometimes results in less uniformity and may produce a weaker concrete, a crumbling material, depending of course on the uniformity and thoroughness of the hand mixing. There was evidence pro and con as to the weakness of concrete made of sand containing a small percentage of loam. There was also evidence tending to show that on the 16th, the day the pier gave way, the top portion was green, looked wet, and was not suitably set or hardened, and that this could be seen from the ground.

It is undoubtedly true that this concrete was not first class, or such as would have been produced by using sand such as was called for by the strict terms of the contract; but there was evidence that it was tested, accepted, and used, all the contracting parties concurring in its use. Whether or not the concrete used in completing pier 10 before the accident was properly and sufficiently mixed was a disputed question. The evidence was not clear that the concrete used to repair and restore the top of pier 10 after the accident was mixed in the same manner as was that used in its completion prior to the accident. However, the fact that this stone, sand, gravel, and cement

actually used both prior to and after the accident made good and suffi-
cient concrete when allowed to stand three or more weeks before used
to carry a load was some evidence that it was not negligence to use
it with the approval and knowledge of the contracting parties; that
is, the owner, the Pennsylvania Steel Company, and the Elmore &
Hamilton Company, and the engineer and superintendent in charge.
The plaintiff gave evidence by actual test that the concrete made of
these materials when properly mixed was not weak and insufficient
for the load it was actually supporting at the time of the accident.
If the Elmore & Hamilton Company was free from negligence in
using it, and it was properly mixed, and there was no negligence in
this respect, and it was properly placed, and the Pennsylvania Steel
Company negligently, or through error of judgment, or ignorantly,
went upon pier 10 with a load before it should have done—that is,
before the pier had time to set and harden under the prevailing weath-
er conditions—it is difficult to see how the Elmore & Hamilton Com-
pany can be charged with willful negligence or any wrong. All this
was left to the jury. It would seem that proof that concrete made of
this material in the proportions called for by the contract and properly
mixed and left from three to five weeks before being subjected to
a load did carry this load was competent evidence as to the sufficiency
of the materials and on the question of negligence in using them.
Would it not have been competent for the plaintiff to show that when
it was used thereafter it gave way under the same load, assuming such
to have been the fact? Would not this have been competent evidence
on the question of the adequacy of the material as matter of fact?

[1] The plaintiff was allowed to show the pressure some of these
same materials would stand and did stand mixed by experts subsequent
to the accident. It was for the jury to say what the strength of these
materials made into concrete was, and whether defendant company
knew or should have known it would make weak concrete.

Pier 10 was completed December 9th and gave way December 16th,
or seven days later, while the load was being placed. The pressure
of the load carried was about 78 pounds per square inch. The tem-
perature during this time ranged from 24 to 57 degrees above zero.
Subsequent to the injury a test of concrete made of these same mate-
rials, under less favorable atmospheric conditions, showed a com-
pression strength at the end of seven days of 758 pounds per square
inch. This concrete was subjected to a pressure of 5,000 pounds, and
while under pressure was struck a blow with a sledge hammer and
again tested, when it showed a compression strength of only 609
pounds per square inch, which indicated that the blow weakened the
concrete. Undoubtedly it would not have withstood this pressure if
improperly mixed. The plaintiff contends that this evidence shows
conclusively that the concrete which gave way was improperly and neg-
ligently mixed, and that this negligence was the cause of the giving
way of the pier; that it gave way under a pressure of 78 pounds per
square inch, when if properly mixed it would have sustained a pres-
sure of at least 600 pounds per square inch, leaving out all questions
of the improper character or quality of the materials. But we have

the evidence that after standing three to five weeks these concrete piers made of these materials sustained the full load they were designed to carry. Hence there was a conflict as to the load these piers, made of these materials properly mixed, would carry if given sufficient time in which to harden. That pier 10 gave way at the end of seven days under a pressure of 78 pounds per square inch indicated under all the evidence one of two things (assuming the material was suitable): That the mixing was negligently and improperly done; or that the concrete pier was prematurely—that is, while soft and green—subjected to the load or pressure of 78 pounds per square inch. If this material actually used, suitably and properly mixed and placed, would have carried considerably more pressure than it did at the end of seven days under prevailing weather conditions, and there had been no dispute on this point, it would follow that the material was improperly mixed and placed. But there was evidence tending to show that perfect material, perfectly and suitably mixed, under the prevailing conditions, would be delayed in setting and hardening so as to bear any considerable load, such as a pressure of 78 pounds to the square inch.

[2] Hence it came around always to the question: Was the giving way of pier 10 due to the negligent use of improper material or to the improper mixing of material good or bad, on the one hand, or to the premature use of the pier before it had had time to set and harden, on the other? If due to the first-mentioned cause or causes, or both, then defendant was liable; but, if due to the last-mentioned cause, the defendant was not liable, as there was no allegation or evidence the defendant company was negligent in allowing or permitting the Pennsylvania Steel Company or its men to go on the pier with their work before it had had time to set and harden. So far as appeared in the case, the Pennsylvania Steel Company was as well informed as the defendant company on this subject. If the defendant company by the use of improper or defective material, or by the improper mixing of such improper material, or the improper mixing of proper and suitable material, for that matter, put up a concrete pier which required a considerably larger time in which to set and harden under prevailing weather conditions than concrete properly mixed, so as to carry a load, and gave no warning, then defendant company was liable if the Pennsylvania Steel Company waited the usual time for the concrete to harden, and on inspection and examination it appeared to be in suitable condition to go upon, and that company was ignorant of the dangerous condition. In such case it would be the negligence of the defendant company in failing to properly mix the concrete, or in mixing improper material, which caused the injury. I think that under all the evidence it was a fair question for the jury whether the concrete of pier 10 was properly mixed. So if, without the knowledge and consent of the others interested, the defendant company substituted material which required a considerably longer time to set and harden than the material specified and which the Pennsylvania Company supposed and had the right to suppose was used, and the pier gave way because not sufficiently hardened, then the giv-

ing way was due to the defendant's wrong, and it was liable. All this was explained to the jury and submitted for its determination.

[3] The plaintiff sought and offered to show that, before going on pier 10, the superintendent of the work being done by the Pennsylvania Steel Company and hence, as it claimed, its employés, was told by the superintendent of the entire work, employed by the owner and known to both the other companies, that this pier was all right to go upon, or would be at the end of seven days from completion, and that this was relied upon by the Pennsylvania Company and its employés. The superintendent was not called as a witness. This, if true, would not tend to establish negligence or the absence of negligence on the part of the defendant company. But would it not establish or tend to establish the absence of contributory negligence on the part of the Pennsylvania Company or of Hollenback, one of its employés, in going thereon when they did? If the steel company or its foreman was assured by the superintendent of the entire work employed by the owner that at the end of seven days—that is, the day it did go on pier 10 and on which that pier gave way—it was or would be safe to go thereon, could it or its employés be charged with contributory negligence in going thereon at the expiration of such time assuming the dangerous condition was not obvious? The evidence offered was rejected and an exception taken. To admit this statement of the superintendent was to admit his opinion or statement as to the length of time necessary for this concrete pier made of these materials and properly mixed to harden. At this time he was superintending the work and was presumed to know all the essential facts. Did this statement, if made and credited by the jury, tend to establish that it was safe to go thereon? Clearly not. Was it information on which the steel company or Hollenback had a right to rely and act to some extent? It seemed to the court on the trial and seems now that this mere expression or statement of opinion by the superintendent was not legitimate evidence of any fact which would justify the Pennsylvania Steel Company or its employés in going on the pier before it had had time to suitably set and harden. The material was then in the presence of all parties, and the mixing and placing was going on in the presence of all who would observe. There was no evidence that the superintendent employed by the owner, and who made the statement sought to be proved, had any control over the Pennsylvania Steel Company or its men in directing when they should or should not go on these piers. Neither the steel company nor its men were under or subject to his orders in this regard. It follows, it seems to me, that his statement as to when it would be safe and proper to go on these piers was no more competent than would have been proof of the expression of an opinion on the subject to the foreman of the Pennsylvania Company by any other person.

[4] It is contended that it was error to allow proof that in May, June, or July, following the accident, this pier was repaired with concrete made of the same material, allowed to stand three to six weeks before placing the superstructure thereon, and that it then bore the load. This did tend to show: (1) That in December the

concrete had not been allowed to harden sufficiently when subjected to the load; and (2) that the material was sufficient for strong concrete if when properly mixed it was allowed to stand long enough. The plaintiff cites many cases holding that when a person or corporation is sued for damages for negligence in erecting or maintaining for use a certain structure, etc., whereby one sustains injury, the plaintiff cannot be permitted to show repairs or improvements or changes made by the defendant after the happening of the accident for the purpose of establishing negligence in the original construction. This is the law unquestionably. Such evidence was formerly admitted quite generally; but modern decisions are almost universally against its admission. It is offered, or may be used, as an admission by defendant that the original construction was defective or improper or that the condition had become defective. The reason for its rejection is tersely stated by Mr. Justice Gray in Columbia R. R. v. Hawthorne, 144 U. S. 202, 207, 12 Sup. Ct. 591, 593 (36 L. Ed. 405), adapting the language of the court in Morse v. M. & St. Louis R. R., 30 Minn. 465, 16 N. W. 358, and Hart v. L. & Y. R., 21 Law Times (N. S.) 261, 263, viz.:

"The true rule and the reasons for it were well expressed in Morse v. Minneapolis & St. Louis Railway, above cited, in which Mr. Justice Mitchell, delivering the unanimous opinion of the Supreme Court of Minnesota, after referring to earlier opinions of the same court the other way, said: 'But on mature reflection we have concluded that evidence of this kind ought not to be admitted under any circumstances, and that the rule heretofore adopted by this court is on principle wrong; not for the reason given by some courts, that the acts of the employés in making such repairs are not admissible against their principals, but upon the broader ground that such acts afford no legitimate basis for construing such an act as an admission of previous neglect of duty. A person may have exercised all the care which the law required, and yet, in the light of his new experience, after an unexpected accident has occurred, and as a measure of extreme caution, he may adopt additional safeguards. The more careful a person is, the more regard he has for the lives of others, the more likely he would be to do so, and it would seem unjust that he could not do so without being liable to have such acts construed as an admission of prior negligence. We think such a rule puts an unfair interpretation upon human conduct, and, virtually holds out an inducement for continued negligence.' 30 Minn. 465, 468 [16 N. W. 358, 359].

"The same rule appears to be well settled in England. In a case in which it was affirmed by the Court of Exchequer, Baron Bramwell said: 'People do not furnish evidence against themselves simply by adopting a new plan in order to prevent the recurrence of an accident. I think that a proposition to the contrary would be barbarous. It would be, as I have often had occasion to tell juries, to hold that, because the world gets wiser as it gets older, therefore it was foolish before.' Hart v. Lancashire & Yorkshire Railway, 21 Law Times (N. S.) 261, 263."

See, also, Corcoran v. Village of Peekskill, 108 N. Y. 151, 154, 155, 15 N. E. 309.

But here the defendant offered evidence of the subsequent repairs and their character and of the material used, not to prove negligence in the original construction, but to show that the owner used the same material in the same way for the same purpose, and that it made good and sufficient concrete when allowed to stand a sufficient length of time before being subjected to a load. The evidence did tend to show that the plaintiff's intestate may have been negligent in going

on the pier too soon, or that, if not negligent, the giving way of the pier was due to the premature use thereof by the plaintiff's intestate working for the Pennsylvania Company, and not to the use of improper materials or to any improper mixing of 'the materials used. I think it was competent to prove that certain of these materials properly combined were used after the accident and proved strong and efficient for the purpose intended as their efficiency for such purpose was in question and challenged. The length of time the material stood before being subjected to a load was also material, and the moment that fact appeared there came into the case the fact that the Pennsylvania Steel Company finally placed the superstructure after the lapse of four to six weeks from the restoration of the pier. Proof of this last fact was not specifically objected to by the plaintiff when proved by one witness; but I think the plaintiff's counsel understood it had been objected to and ruled on by the court, and at a prior time it was specifically objected to and admitted, as we shall see.

Could not a defendant, sued for negligence in making and selling weak and insufficient wagon wheels whereby the purchaser and user was injured, the insufficiency and weakness of the timber used being charged, show in defense that he had used the same timber for years in making such wheels both before and after the accident, and that they had been actually used and had proved strong and sufficient? And could not the plaintiff show in proving his case that other wheels of the same size made of the same timber by the defendant had broken, gone to pieces, and been shown by actual use both before and after the accident in question to be dangerous because of the weakness of the timber? Or would mere opinions be substituted for these actual facts?

Going on pier 10 prematurely was not necessarily contributory negligence; but it may have been the sole cause of the giving way of the pier. Here, until we come to the fact that the Pennsylvania Company placed the superstructure after the accident, the reason of the rule above referred to is absent. The defendant gave the evidence as to the reconstruction of this pier and the materials used and the length of time the concrete was allowed to stand before being subjected to a load for the purpose of showing the good character and sufficiency of the material. The reconstruction of the pier alone was done, not by the defendant company, but by the owner, the Berkeley Company, and could not operate as an admission of the defendant company that it was negligent in the original construction, or as an admission by the Pennsylvania Steel Company, or its employé, that it was negligent in going on the pier at the end of seven days after its completion. Mere reconstruction was not a fact tending to show that this material was proper and sufficient when properly mixed, but proof that if it was allowed to stand three to six weeks, and that it was then hard and solid, tended to show that it required more than seven days in which to harden or set sufficiently to carry a load. Proof of this fact of waiting three to six weeks after the accident also tended to show that the Pennsylvania Steel Company with its men commenced operations on pier 10 too soon prior to the accident, and, as the proof also

showed that the Pennsylvania Company waited three to six weeks after the reconstruction of the pier was complete before placing the superstructure, the jury might have said this was an admission on its part that it went on that pier in the first instance too soon and was negligent in so doing.

If A. is sued by B. to recover damages for negligence in supplying improper and defective sand and cement or lime for the mortar used in laying a high wall in which B. was at work placing timbers, whereby the wall was made weak, and hence crumbled and fell, causing the injury, could not A. show that the sand and cement were strong and suitable for the purpose, and that the wall fell because of plaintiff's negligence in going thereon with timbers too soon and while it was green, by proving that after the accident the same materials were used by defendant to reconstruct the wall, and that after standing a suitable time the wall was strong and bore the load without showing weakness? But would it be competent for the defendant to show that the plaintiff himself waited a longer time than at first before going on the reconstructed wall?

In the case at bar there was no change in material or mode of construction of the pier by any one when the pier was reconstructed. The only change in operations was that, after the pier was reconstructed by the owner with the same material in the same way as before, it was by the Pennsylvania Steel Company allowed to stand some four to six weeks before being subjected to a load. Assume that the Pennsylvania Steel Company is shown by this evidence to have waited from four to six weeks before going on the reconstructed pier, and that thereby the jury may have been led to conclude it admitted that it went on the pier too soon in the first instance, was the evidence any the less admissible? It may be argued the Pennsylvania Company was not negligent in the first instance; but, in view of what happened on the 16th of December, it had the right to use the precaution of waiting from four to six weeks, instead of seven days, before placing the load on the reconstructed pier, and that admitting the evidence in question was allowing a subsequent act of precaution taken by the Pennsylvania Steel Company in the light of experience and added knowledge to be used against the employé as an admission by said company that it went on pier 10 too soon or negligently in the first instance. The admissions of the Pennsylvania Steel Company made after the accident and injury, either by words or by acts, were not admissible against the administrator of Hollenback. If this may have been the effect of the admission of this evidence that the Pennsylvania Company waited three to six weeks as stated, and its use was not properly limited by the court, and its reception was objected to properly, then the ruling admitting the evidence was prejudicial error, and the plaintiff is entitled to a new trial. The question of the negligence of the Pennsylvania Steel Company was in the case and was brought in by the defendant company, which contended that the Pennsylvania Steel Company was negligent in going upon the pier with this heavy load at the end of seven days, and that its negligence or the premature

use of the pier was the proximate and producing cause of the injury to its employé Hollenback. The court charged:

"The defendant has given evidence tending to show that the concrete was composed of proper and suitable materials, sand, cement, and broken stone, which were suitably, properly, and sufficiently mixed and properly placed in the forms, and that such forms were left in position the necessary length of time: but that, on account of weather conditions, cold or freezing weather conditions, the concrete had not sufficiently hardened or set when subjected to the weight and pressure placed thereon, and that the weight was placed thereon prematurely and negligently by the Pennsylvania Steel Company, and that, for this reason, it was not safe to put the weight and pressure, to which it was subjected, upon it; and that, because of this premature subjecting of pier 10 to this great weight and pressure, the negligence of the steel company, it gave way and caused the accident and injury to the plaintiff's intestate and his consequent death.

"If, gentlemen, you find this to be the truth of the case, then the plaintiff cannot recover in this action, for, in such case, the injury to the plaintiff's intestate, and his consequent death, would not be the result of the negligence of the defendant company, but the result of negligence or want of care or of poor judgment on the part of the Pennsylvania Steel Company."

When the offer of proof by the witness Angle came as to what was done after the accident by way of reconstructing pier 10, the materials used, etc., including the time that was allowed to pass before going on the reconstructed pier with the superstructure, strenuous objection was made and repeated. The court in ruling on the objections, after stating the facts the defendant sought or was seeking to prove, said:

"Now the defendants are seeking to show, as I understand, they took off the top, and they not only found it hard, but he (witness) says they had to chisel it, and when they did they couldn't break the stone up, they had to cut through the stone. Now they seek to show, as I understand, what they are at, they have got some evidence to that effect, that they took the same sand from the same place, the same quality and character, the same foreign substance in that there was in that first used, the same stones from same quarry, broken with the same crusher, and the same cement, same quality, mixed it in the same proportions, and in the same manner, and put it up there and let it stand longer than seven days, then I suppose they intend to show that it was firm, hard, and all that sort of thing; show that it is proper material, and that if it was put up there and let alone that it will harden and be of sufficient strength. They seek to show from that that this injury occurred because of the negligence of the Pennsylvania Steel Company in not properly inspecting that pier and in going on it prematurely when it was green and endangered the men in their hurry. Now that is about the sum and substance of what they are driving at, as I understand it."

The court then made other remarks on the subject and concluded:

"So in that view I overrule the objections and give them (plaintiff) an exception."

There was a plain statement by the court of the evidence offered or sought to be introduced and of its purposes, and one of such purposes was to show that the accident and injury were the result of the negligence of the Pennsylvania Steel Company, and one of the facts to be proved ruled upon was that the reconstructed pier was allowed to stand more than seven days before placing the superstructure thereon. The court evidently did not intend to rule, and there was no ruling, that such delay in placing the superstructure subsequent to the accident could be used or admitted as evidence of an admission

by the steel company or its employé Hollenback that the pier was used too soon in the first instance, but it was admitted generally and without limitation as to the purpose for which it could be considered, and the jury was not instructed it could not be used or considered by them as an admission. I· cannot say that the admission of this evidence, without any limitation at the time as to the purpose for which it could be considered by the jury, and in the absence of such a limitation in the charge, was harmless or not prejudicial to the plaintiff. The question of the negligence of the Pennsylvania Steel Company in prematurely placing the superstructure prior to the accident was one of the vital ones in the case. The mere fact that that company did wait from three to six weeks before placing the superstructure subsequently to the accident may have determined the verdict. If the defendant had based its defense solely on the grounds that the materials used were proper and suitable, that the mixing and placing of the concrete was properly done, but that the weather conditions were such that they delayed the setting and hardening of the concrete, a fact known to all if known to any one, and had left out of the case any contention or claim that the Pennsylvania Steel Company, or Hollenback, was negligent in going on pier 10 with this load, in my opinion all the evidence given would have been competent. But with the contention in the case that the Pennsylvania Company and Hollenback were negligent, and that their negligence, especially that of the Pennsylvania Company, caused or contributed to the injury of Hollenback, admissions of the steel company made after the accident and injury, either by words or acts, were prejudicial and incompetent evidence. The fact that the Pennsylvania Steel Company placed the steel structure on the pier after the accident and reconstruction was immaterial, harmful probably, and could as well have been omitted from the case. For legitimate purposes it was all sufficient to show that the load was not placed, after the reconstruction of the pier, until the lapse of some weeks. In Corcoran v. Village of Peekskill, 108 N. Y. 151, 155, 15 N. E. 309, the action was against the village for negligence in allowing an area next the walk in front of a dwelling house to remain open and unfenced, whereby the plaintiff fell in and was injured. The main question was whether this area was sufficiently guarded to protect travelers on the street. Evidence was permitted that after the accident the owner of the premises built a fence around the area. This was held to be fatal error. See, also, cases cited in the opinion in that case.

[5] Evidence competent for one purpose but incompetent for another may be admitted to answer the purpose for which competent; but its admission and use should be limited to that purpose, and the jury should be told they are not at liberty to use or consider it for any other. In Clapper v. Town of Waterford, 131 N. Y. 382, 389, 30 N. E. 240, 242, the action was against the town for negligence of the commissioner in not keeping the highway in repair. One defense was want of funds to make repairs. The plaintiff offered to show and was permitted to prove, for the purpose of showing the commissioner's control over the highway and that he had funds for

repairs, that some days after the accident he was seen repairing it. The court said:

"Upon whatever pretense such evidence is put into the case, it is generally used to mislead the jury. It is sometimes accepted by them as an admission of negligence, and its natural tendency is undoubtedly to influence them in that direction."

It was held prejudicial error to admit the evidence, as it was not essential for one of the purposes for which admitted, to show control over the highway, and had no tendency to show the possession by the commissioner of funds at the time of or prior to the accident complained of.

I think the Circuit Court of Appeals, in view of its decision in Barber Asphalt Paving Company v. Odasz, 60 Fed. 71, 73, 8 C. C. A. 471, would grant a new trial in this case because of the reception of this evidence as to who replaced the superstructure under the general objection made, even though the question to the witness Angle, which brought out the fact that the Pennsylvania Steel Company placed the steel superstructure on pier 10 after the accident and reconstruction, was not specifically objected to. During the examination of the defendant's witness Cullen, the same question arose, and the following took place:

"Q. How long after the pier was reconstructed before the Pennsylvania Company—oh, you say the Berkeley Company suspended work in December? A. Yes, sir.

"Q. After the completion of this pier? A. No, sir.

"Q. How long after the completion of this pier was it, if you can tell the jury, before the company went upon it? A. Four or five weeks.

"Q. Just a minute, let me finish my question, to work?

"Mr. Matterson: What pier have you reference to?

"Mr. Borst: Pier 10.

"The Court: After it was repaired?

"(Objected to as illegal, improper, not binding upon this plaintiff, anything done subsequent to the injury. Objection overruled. Exception.)

"The Court: He may show how long they waited before they went on.

"A. Four or five weeks."

I think this presented the question in such shape that the ruling was clear error. The court said:

"He (defendant's counsel) may show how long they (Pennsylvania Company) waited before they went on."

True this preceded the examination of Angle before referred to, but it was not necessary to repeat the objection which I think sufficiently raised the question presented here.

In the case last referred to the witnesses were asked whether they could tell a way by which the accident could have been prevented. One witness in answer said:

"There is a platform made there now, but it was not there then, to prevent the car from falling."

And another witness in answer said:

"The tramway is made different from its construction when Odasz was killed."

When questions were directly asked as to whether or not changes or improvements had been made after the accident, objection was made

and sustained and the evidence excluded. The Circuit Court of Appeals said:

"The judge excluded the questions when directly and formally asked for the purpose of showing negligence before the accident; but the quoted answers slipped in, ostensibly in reply to the question whether the track was capable of a construction which would prevent accidents. The testimony was wanted by the plaintiff's counsel for the purpose of proving negligence. The answers showed the jury that changes had been made after the accident for the purpose of preventing similar calamities in the future. A plausible but untrue inference from this class of testimony is apt to be that the subsequent act, for the purpose of securing perfect safety in the light of past experience, is an admission of a previous omission to take proper precautions, and has an effect to call the minds of the jury away from the real issue, which is that of reasonable, but not extraordinary, care at the time of the accident, in view, among other considerations, of previous and universal experience."

[6] Here, during the examination of Mr. Angle, the court, by making its statement as to what it understood the defendant was seeking to prove and the purpose of it, as above quoted, and then stating it thought the evidence competent and thereupon overruling the objection, in effect gave the plaintiff's counsel to understand it was not necessary to further object.

However, during the examination of the witness Cullen, as we have seen, the question was raised, and the court said in overruling the objection:

"He may show how long they (the Pennsylvania Steel Company) waited before they went on."

This referred to the going on the pier after its reconstruction with the superstructure. In view of all that took place, I am of the opinion the objections made were sufficient, not waived, and that prejudicial error was committed which demands a new trial. See, also, Dale v. D. L. & W. R. Co., 73 N. Y. 468; Dougan v. Champlain T. Co., 56 N. Y. 1. On a retrial every essential fact may be proved without showing that the Pennsylvania Steel Company had anything to do with placing the steel superstructure after the reconstruction of the pier which followed the accident.

It is true that the evidence was not offered to show negligence on the part of the Pennsylvania Steel Company, or of Hollenback, and there was no suggestion in the objection that it might be so used and was for that reason inadmissible; but the fact remains, as we have seen, that it was immaterial who or what company waited three to six weeks before going on the reconstructed pier after the accident, and it was dangerous to permit proof that the Pennsylvania Company, who went on the pier at the end of seven days before the accident, waited from three to six weeks after the accident before going thereon. The jury could have and may have used this fact as an admission of negligence made by that company after the accident and against the administrator of Hollenback. The jury was not told they must not so use or consider it.

The motion to set aside the verdict and for a new trial is granted, and the order will be entered as of the date of the close of the trial; the term having been held open for the purpose of the motion.